868 F.2d 195
 Janice K. SCHULER, Co-Personal Representative of the Estate
of Charles F. Schuler, Deceased; Ethelyn M. Wilson,
Personal Representative of the Estate of Richard J. Wilson,
Deceased, Plaintiffs-Appellees, Cross-Appellants,
v.
UNITED STATES of America, Defendant-Appellant, Cross-Appellee.
 Nos. 87-2142, 87-2143, 87-2170 and 87-2178.
 United States Court of Appeals,
Sixth Circuit.
 Argued Dec. 6, 1987.
Decided Feb. 23, 1989.
Rehearing and Rehearing En Banc Denied May 3, 1989.
 
 Richard L. Clark, U.S. Dept. of Justice, Barbara B. O'Malley (argued), Washington, D.C., for defendant-appellant, cross-appellee.
 Richard F. Schaden, Kathleen O'Brien Schaden (argued), Schaden, Heldman & Lampert, Denver, Colo., for plaintiffs-appellees, cross-appellants.
 Before MARTIN, JONES, and NORRIS, Circuit Judges.
 BOYCE F. MARTIN, Jr., Circuit Judge.
 
 
 1
 This case involves a crash at Muskegon County Airport in Michigan of a Cessna 401 twin engine, four passenger airplane which developed engine trouble after takeoff. The United States challenges the district court's finding that air traffic controllers negligently handled the return and attempted landing of the impaired Cessna 401, and that this negligence was the proximate cause of the accident, 675 F.Supp. 1088. Based on In Re Air Crash Disaster at Metropolitan Airport, 619 F.Supp. 13 (E.D.Mich.1984), aff'd 782 F.2d 1041 (6th Cir.1985), we reverse the district court.
 
 
 2
 The entire accident involving the Cessna and the air traffic controllers occurred in the span of 35-40 seconds. In the early summer evening of June 30, 1981, two minutes after takeoff at 6:10:01 pm (6:10 and one second), the pilot, Richard Wilson, radioed air traffic control that he had lost an engine and was returning to the airport. He requested to land on runway 32 "if OK". Prior to Wilson's return to the airport, a multi-engine, turbo prop, Air Force C-130 Hercules transport plane was making practice landings on runway 36, taxiing down runway 14, the "reciprocal or extension" of runway 32, and then taking off on runway 23 again. At 6:10:07, radar controller Ryan gave Wilson visual approach clearance to land on runway 32. At 6:10:09, the C-130 contacted Johnson, the local controller, requesting to do the "same thing". At 6:10:13, Mr. Wilson communicated with Ryan to "get the military off the runway". Two seconds later at 6:10:15, local controller Johnson told the C-130 to make a 180 degree turn and exit runway 14, the extension to runway 32. At 6:10:23, the C-130 responded with "Roger" and proceeded to exit the runway. At 6:10:35, Ryan, the radar controller, gave Wilson landing clearance. At 6:10:42, there was the sound of the emergency locater transmitter indicating that the plane had crashed. The Cessna had banked steeply to the side of the inoperable engine, had stalled and plunged to the ground. The fall from the time of stalling to the moment of impact was approximately 3 to 5 seconds. Upon impact, the Cessna burned and all passengers aboard, including Charles Schuler, were killed. The distance from the crash site to the beginning of the threshold of runway 32 was approximately 1/4 mile.
 
 
 3
 Janice K. Schuler, personal representative of the estate of Charles F. Schuler, and Ethelyn M. Wilson, personal representative of the estate of Richard J. Wilson, brought a wrongful death action pursuant to the Federal Torts Claims Act arising out of the airplane crash at Muskegon County Airport. The district court found that the defendant United States, acting through its employees, the Federal Aviation Administration Air Traffic Controllers, was 20% negligent with respect to the airplane crash. The court found that the air traffic controllers breached their duty to (1) keep the runway clear and (2) keep Wilson informed of the situation on the ground with regard to the C-130. After Wilson told the air traffic controllers at 6:10:13 to "get the military out of there," air traffic control made no response to Wilson until 6:10:35 when radar controller Ryan gave Wilson landing clearance. The court found that the air traffic controllers were obligated to communicate to Wilson the position of the C-130; that it was inappropriate to make no response whatsoever. The court found that such negligence was a proximate cause of the death of Schuler and Wilson. The court stated that the C-130 on the runway caused Mr. Wilson "to delay and that delay caused him to overshoot the runway, which required him either to bank back to land on runway 32 or to exercise another option of attempting to land on runway 23." Finally, the court found that Wilson, the owner and pilot of the plane, was 80% negligent with respect to the crash and that such negligence was a proximate cause of the deaths of Schuler and Wilson.
 
 
 4
 On appeal, the United States argues there was no duty owed to Schuler and Wilson, but even assuming that such a duty did exist, breach of that duty was not the direct and proximate cause of their death.
 
 
 5
 The air traffic controllers clearly did not breach their duty to keep the runway clear. The landing runway was not required to be free of obstruction until the Cessna crossed the threshold. In busy airports, a runway is always obstructed for part of the time that another airplane is approaching the runway. However, at the point where the arriving airplane crosses the landing threshold, the obstruction must be cleared. Air Traffic Control Handbook, 7110.65B, paragraphs 902, 1120b(3), and 1122. Radar controller Ryan complied precisely with the air traffic control handbook procedures by clearing Wilson to return to the airport, but withheld the issuing of clearance to land until he was able to determine that the C-130 would be clear of the runway at the time the Cessna crossed the landing threshold. There was no duty that the runway be clear at the time that the approach clearance was issued. There was testimony that the runway would have been clear when the Cessna crossed the threshold based on the calculations of the movements of the Cessna and the C-130. The C-130 made its 180 degree turn at the far northern end of runway 32. The Cessna crashed approximately one-quarter mile short of the threshold of runway 32. The length of runway 32 was 2 1/2 times as long as the distance needed to land the Cessna safely. From the point where the Cessna went out of control, it was 11 seconds flying time to the runway threshold. If the Cessna had not crashed, it would have crossed the runway threshold at 6:10:50. The C-130 would have been completely clear of the runway at that time. Given the position of the C-130, the length of the runway, and the Cessna's distance from the threshold, no potential conflict existed between the Cessna and the C-130 except in the mind of Wilson, the pilot. See Air Traffic Control Handbook, 7110.65B, paragraph 796(c).
 
 
 6
 Neither Ryan nor Johnson could have acted any quicker or more correctly than they did in the 14 second time period which elapsed between the time that Wilson called at 6:10:01 and the time that Johnson instructed the C-130 to turn around at 6:10:15. The C-130 was controlled on a different radio frequency by Johnson, the local controller, and the incoming Cessna was controlled by the radar controller, Ryan. Johnson was not in a position to stop the C-130 or know that it should have been stopped independent of a communication from Ryan, the radar controller, that Wilson was arriving on the runway. After Ryan informed Johnson of the approaching Cessna, Johnson acted promptly to remove the C-130. Ryan had no duty to make communications to Wilson between the time that Wilson told Ryan to get the military off the runway and the time that Ryan gave Wilson landing clearance. The district court cited no source, nor can we find any source imposing a duty of constant communication between a radar controller and a pilot during clear weather conditions with regard to visible ground level situations after an approach clearance is given and before a final landing clearance is issued. We see no purpose in imposing such a burden on air traffic controllers.
 
 
 7
 Recorded cases clearly state the legal duty, that although the air traffic controllers must exercise reasonable care, "under VFR [visual flight rules] conditions, the primary responsibility for safe operation of the aircraft rests with the pilot, regardless of traffic clearance." Coatney v. Berkshire, 500 F.2d 290, 292 (8th Cir.1974). See Redhead v. United States, 686 F.2d 178, 183 (3d Cir.1982); In Re Aircrash Disaster at New Orleans (Moisant Field), Louisiana on March 20, 1969, 544 F.2d 270, 276 (6th Cir.1976); Bibler v. Young, 492 F.2d 1351, 1358 (6th Cir.), cert. denied, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974); Spaulding v. United States, 455 F.2d 222, 226-27 (9th Cir.1972) ("The controller's duty to warn does not, however, relieve the pilot of his primary duty and responsibility. The pilot has a continuing duty to be aware of danger when he can gather adequate information with his own eyes....").
 
 
 8
 The representatives of Wilson and Schuler offer Himmler v. United States, 474 F.Supp. 914 (E.D.Penn.1979), and Dyer v. United States, 551 F.Supp. 1266 (W.D.Mich.1982), as a source for the air controllers duty to communicate with a pilot during an emergency situation.[1] Himmler is distinguishable from this case and does not apply to the facts of the present case. Himmler involved a bad weather emergency situation where an inexperienced VFR (visual flight rules) pilot was forced to land using his instruments. In our case, the weather was good and visibility clear. Dyer is inapposite as it also deals with a VFR (visual flight rules) trained pilot caught in bad weather requiring an instrument trained pilot.
 
 
 9
 Even if we assume the United States had breached the duties as described by the district court, given In Re Aircraft Disaster at Metropolitan Airport, 619 F.Supp. 13 (E.D.Mich.1984), aff'd 782 F.2d 1041 (6th Cir.1985), the district court was clearly erroneous in holding that the air traffic controllers proximately caused the accident. In In Re Aircraft Disaster at Metropolitan Airport, a small passenger jet was making an approach to land at Detroit Metropolitan Airport. A Delta Airlines passenger jet was taking off on the same runway. The air traffic controller did not provide sufficient spacing between the arriving Learjet and the departing Delta jet. The Learjet pilot slowed his aircraft to allow the Delta jet time to get off the runway. The Learjet suffered an aerodynamic stall when its speed became too slow and a crash resulted. The court held that even if the air traffic controller was negligent, the action by the pilot in causing an aerodynamic stall "was not a natural, continuous and foreseeable result of the failure to assure minimum separation." Id. at 18. In visual conditions, the primary responsibility for safe operation of the aircraft rests with the pilot, regardless of the air traffic clearance. Id. at 20.
 
 
 10
 Here the district court stated that, apart from the conduct of the controllers, Wilson elected to place his aircraft 1/4 of a mile beyond the threshold of the runway. He was flying at an excessive rate of speed given that one of the Cessna's engines was inoperable. Wilson knew or should have known that he could not make the bank that he attempted and then position his aircraft for a landing on runway 32. Wilson banked the plane in excess of the angle that would cause the plane to stall. Wilson banked into the dead engine. The district court held that Mr. Wilson knew or should have known that the bank should not have been so steep given the circumstances. The district court stated that "the crash was caused by the bank that was too steep." Given these fact findings it was clearly erroneous for the district court to hold that the conduct of the air traffic controllers was a proximate cause of the accident. In both cases, In Re Aircraft Disaster at Metropolitan Airport and the present case, the Learjet pilot and Wilson had a clear view of the runway. In In Re Aircraft Disaster at Metropolitan Airport, the air traffic controller was not required to foresee or anticipate the "unlawful, negligent or grossly negligent acts of pilots." Id. at 20. Likewise, the controllers in this case were not required to foresee that Wilson would "act negligently or unlawfully" in stalling the Cessna. See 14 CFR Sec. 91.9 (no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another). Ryan was simply unable to foresee that Wilson would place the Cessna too close to the airport, too quickly, and at an excessive rate of speed as he returned to land at the airport. None of these acts had anything to do with the C-130. Wilson exercised his own judgment and banked into the dead engine causing the stall and resulting crash.
 
 
 11
 For the reasons we have stated, we reverse the district court, and remand the case to the district court to dismiss the complaint against the United States.
 
 
 
 [1]
 Wilson/Schuler actually offer Himmler as an alternative to In Re Aircraft Disaster at Metropolitan Airport. However, Himmler goes to the question of breach of duty, not to the issue of proximate cause